DARRELL WAYNE BUTLER,

        Plaintiff,

v.                                       Case No. 3:18-cv-293-J-32JRK

WILLIAM B. BLITCH, et al.,

        Defendants.

_____

## ORDER

### I.   *Status*

Plaintiff, an inmate of the Florida penal system, is proceeding on a pro se Civil Rights Complaint (Doc. 1) raising claims of excessive force and failure to intervene against Defendants Blitch, Butler, Lee, and Tomlin. Before the Court is Defendants' Motion for Summary Judgment (Doc. 59). In support of their Motion, Defendants submitted a transcript of Plaintiff's deposition (Doc. 59-1), a use of force packet (Doc. 59-2), a handheld video of the cell extraction, an audio clip of Plaintiff's, Sergeant Wesley Rogers', and Sergeant Austin Merritt's interviews with the Inspector General,[1] and the Declaration of Dr. Timothy Whalen (Doc. 59-4). Plaintiff was advised of the provisions of Federal Rule of

---

[1] Sergeant Rogers and Sergeant Merritt were part of the cell extraction team. They are not, however, named as defendants in this case.

Civil Procedure 56, as well as that the granting of a motion for summary judgment would result in the termination of this case. <u>See</u> Order (Doc. 8). Plaintiff filed a Brief in Opposition (Doc. 76) with exhibits, including his Declaration (Doc. 76-1), Statement of Disputed Facts (Doc. 76-2), some discovery documents and Court filings, his deposition, the incident report, and some medical and mental health records.

## II. *Parties' Positions*

Plaintiff alleges as follows in the Complaint:

> On October 6, 2017 at about 5:45 PM[,] defendant Blitch approached the plaintiff in front of the shower on the 1100 side of I-Wing. At which time defendant Blitch ordered plaintiff to submit to hand restraints for re-location to the medical clinic for placement on "SHOS"[2] status.[3]

> Plaintiff Butler then advised defendant Blitch he would submit to handcuffs immediately following his personal property being procedurally inventoried in the plaintiff['s] presence[ p]rior to being separated from such. Defendant Blitch refused to honor the plaintiff['s] advisement.

> Defendant Blitch left and reappeared with a "Cell Extraction Team," opened the shower door and stood outside the shower and allowed and permitted his subordinates to utilize improper excessive physical, malicious and sadistic force to deliberately

---

[2] Self Harm Observation Status.

[3] Plaintiff had previously declared a psychological emergency and upon a doctor's order, he was being placed on SHOS status. <u>See</u> Doc. 59-1 at 4-5.

cause pain, serious harm, and extensive injury to the plaintiff.

During such unprovo[ked] assault[,] defendant Blitch eye-witnessed [and] he failed to cease his insubordinates from illegally beating the plaintiff with handcuffs and naked fist to which the plaintiff sustained large gashes, lacerations, permanent scarring to the face, scalp, etc. and numerous bruises and abrasions to his left arm.

Doc. 1 at 8-9 (paragraph enumeration omitted). Plaintiff then details the acts of each Defendant who was a member of the cell extraction team.

On October 6, 2017 defendant Tomlin spoke death threats of how he was going to beat the [plaintiff] prior to dressing up in riot gear. When defendant Tomlin entered the shower dressed in riot gear on the 1100 side he first began beating the plaintiff['s] left hand and wrist with steel handcuffs. After the defendant Tomlin gained his way inside the shower[,] he immediately started brutally beating the plaintiff in the face, scalp, with iron handcuffs which caused the plaintiff to sustain large gashes, and lacerations and the los[s] of much essence of life (blood).

On October 6, 2017 defendant R. Lee entered into the 1100 side shower wearing riot gear. Once he entered the shower[,] he started beating the plaintiff in the face with his naked fist which caused the plaintiff to sustain a loose tooth and a large gash to the right side of the plaintiff['s] right eye.

On October 6, 2017 defendant Butler was the lead officer wearing riot gear and holding a large shield. Defendant Butler applied physical pressure to gain entry inside the 1100 side shower[. O]nce he made his way into the shower[,] he and the plaintiff ended up on top of the tile wall and the plaintiff

observed the defendant Butler taking a punch at the plaintiff['s] facial area with his naked fist. The defendant['s] actions caused the plaintiff to sustain a blackeye.

On October 6, 2017 after the use of force occurred[,] Defendants Blitch, Tomlin, R. Lee, and Sgt. Butler all escorted the plaintiff out of I-Wing[, and] down the corridor into the clinic for treatment to which the plaintiff refused treatment due to trauma, but requested for photos of his injuries and appearance. But the staff in medical and security denied the plaintiff['s] request.

Thereafter, the defendants then escorted the plaintiff into the shower area inside the clinic and strip[] searched the plaintiff then placed the plaintiff into "SHOS" cell A-1102.

Id. at 9-10. As relief, he seeks declaratory, injunctive, and monetary relief. Id. at 11.

In their Motion for Summary Judgment, Defendants argue that they are entitled to qualified immunity because they were performing discretionary functions, they did not violate Plaintiff's constitutional rights, and Plaintiff has failed to demonstrate a physical injury sufficient to state a claim for compensatory or punitive damages. See Doc. 59. Defendants contend that "Plaintiff refused a lawful command to submit to hand restraints," the cell "extraction team was called," and they used force to obtain Plaintiff's compliance with a lawful command. Id. at 5. In the Report of Force Used and Incident Reports, Defendant Blitch; each cell extraction team member,

including all Defendants; and others provided a narrative summary of what occurred. <u>See</u> Doc. 59-2 at 1-3, 8-17. The narratives are largely the same.

Defendant Blitch was the shift supervisor during the cell extraction. His comment on the Incident Report reads as follows:

> Organized physical force was utilized on [Plaintiff] due to [Plaintiff] refusing to submit to handcuffing procedures to carry out the orders of Dr. George Emanoilidis. Dr. G. Emanoilidis ordered for [Plaintiff] to be placed on SHOS Status due to his suicidal gestures. At approximately 5:26PM, LPN K. Burgin utilized her Crisis Intervention Techniques to bring [Plaintiff] into compliance with a lawful command, to no avail. At approximately 5:31 PM, Warden Barry Reddish was contacted and authorized the use of forced cell extraction team to carry out Dr. G. Ema[n]oilidis['] orders as written to bring [Plaintiff] into compliance with a lawful command. Camera Operator #1, Officer Patrick Moore, commenced filming at approximately 5:43PM. At this time, I conducted a self-introduction and opening statement. The forced cell extraction team conducted an introduction; video recording was continuous until the conclusion of the incident. I ordered the team members to utilize the minimal amount of force necessary to bring [Plaintiff] into compliance with lawful commands. At approximately 5:45PM, I ordered [Plaintiff] to submit to handcuffing procedures or the forced cell extraction team would be utilized to bring him into compliance, to no avail. At approximately 5:46pm, I unlocked and opened the shower stall door and [Plaintiff] lunged towards the shower bars causing the protective shield to strike [Plaintiff] in the facial area. [Plaintiff] then grasped the shower bars refusing to place his hands behind his back, so hand restraints could be applied. Sergeant Tomlin then delivered several distractionary blows to [Plaintiff's] forearms causing [Plaintiff] to relinquish his grasp of the

shower bars. Sergeant Butler and Sergeant Merritt then forced [Plaintiff] to the back of the shower and inadvertently tripped over the shower curb causing [Plaintiff] to strike his head on the back shower wall and the shower floor. [Plaintiff] continued to provide resistance refusing to submit to handcuffing procedures. Sergeant Merritt was able to apply the right hand restraint. [Plaintiff] continued to provide resistance by grasping his state issue[d] blue shirt with his left hand refusing all orders to submit to hand restraints. At this time, Sergeant Merritt delivered one closed fist strike to [Plaintiff's] upper left forearm causing [Plaintiff] to relinquish his grasp of his state issued blue shirt so the hand restraints could be applied. At approximately 5:47 PM, the team members were able to apply the remaining restraints [and] all force ceased. [Plaintiff] was assisted to his feet. Upon arriving on the second floor of I-Wing, the waist chain, black box and red lock were applied. At approximately 5:52PM, [Plaintiff] refused a post use of force physical but was visually assessed by RN[] A. Turbyfill with the following injuries: abrasion to the forehead. [Plaintiff] received a clean SHOS Shroud and was re-housed in cell A-1101s, on SHOS status. I conducted a closing statement and Camera Operator #1 ceased filming. During the filming, [Plaintiff] alleged that staff used excessive force during this incident which is refuted d[ue] to this incident being captured on handheld camera[. A]t no time was there any wrong doing by staff. All staff received post use of force physicals with no injuries noted. At approximately 6:20PM, Warden Barry Reddish[] was notified of the amount of force utilized. At approximately 6:26PM, EAC Duty Officer Angel was contacted and issued EAC#2017-10-28078. [Plaintiff] received (2) two Disciplinary reports for "6-1" "Disobeying a verbal order" written by Sergeant William Fishley and myself. [Plaintiff's] property was inventoried by Sergeant Fishley and Officer Sean Hanson and secured in the property room. A (DC6-220) "Inmate Impound of Personal property" and A (DC6-163) "Close management privilege suspension"

was completed. Camera Operator #1, Officer P. Moore, downloaded the recording to DVD#A-5473. Officer P. Moore completed a DC1-801 and placed it, along with the DVD, in the video recording drop box. Forward to Chief of Security.

Id. at 8-9.

According to Defendant Butler, who was the #1 team member who entered the shower cell holding the shield, when the cell door was opened, Plaintiff "lunged towards the shower bars causing the protective shield to strike [Plaintiff] in the facial area, [and Plaintiff] then grasped the shower bars with both hands." Id. at 1. Defendant Butler continues:

> I relinquished the protective shield and grasped [Plaintiff] around the torso with both arms while clasping my hands and pulled [him] to the back of the shower cell in an attempt to break [his] grasp, to no avail. Sergeant Teddy Tomlin then delivered several distractionary blows to [Plaintiff's] forearms, breaking [Plaintiff's] grasp. At this time, with the assistance of Sergeant Austin Merritt we forced [Plaintiff] to the back of the shower stall. Upon forcing [Plaintiff] to the back of the shower I inadvertently tripped over the shower curb, causing [Plaintiff] to strike his head against the shower wall and floor. I maintained my hold of [Plaintiff] until all restraints were applied. Once all restraints were applied all force ceased.

Doc. 59-2 at 1.

Defendant Tomlin, who was the #2 team member, stated that when he was delivering the "distractionary blows" to Plaintiff's forearms, he "inadvertently had the hand restraints in [his] closed fist but never made

contact with the hand restraints to [Plaintiff's] forearms." Id. at 3. Sergeant Merritt, the #3 team member, who is not a defendant in this case, stated that after Defendant Butler and Plaintiff "inadvertently tripped over the shower curb," Plaintiff "continued to provide resistance." Id. At that time, Sergeant Merritt, "grasped [Plaintiff] by the right arm and was able to apply the right hand restraint. [Plaintiff] then grasped his state issued blue shirt with his right hand and refused all orders to relinquish his grasp so the restraint could be applied." Id. Sergeant Merritt then "struck [Plaintiff] in the upper left forearm causing [him] to relinquish his grasp." Id. Defendant Lee, the #5 team member, stated that after Defendant Butler and Plaintiff "inadvertently tripped over the shower curb," he "grasped [Plaintiff] by the lower extremities and assisted Sergeant Wesley Rogers in applying the leg restraints." Id. Defendant Lee "repositioned [his] grasp and assisted Sergeant Butler in pinning [Plaintiff] to the shower stall floor. [Plaintiff] continued to provide resistance by grasping his state issued blue shirt refusing all orders to submit to hand restraints." Id. All Defendants agree that once all restraints were applied, all force ceased. Id. at 1, 3.

A handheld video captured the entire cell extraction. The video begins with Defendant Blitch giving an introductory statement and the cell extraction team members introducing themselves and explaining their duties upon

8

entering the cell.[4] Each team member stated he was trained in forced cell extractions. Defendant Blitch advises the team members to use the minimal amount of force necessary. The cell extraction team then calmly walks in an organized fashion to the shower cell where Plaintiff is located.

At about the 2:55 minute mark on the video, Defendant Blitch gives Plaintiff a final order to submit to hand restraints and be housed on SHOS, and Defendant Blitch advises Plaintiff that his failure to do so will result in the cell extraction team being utilized. Plaintiff is standing right at the cell door, but he does not put his hands through the slot to be handcuffed. He says something but it cannot be heard on the video.

At about the 3:06 minute mark, the cell door is opened and Plaintiff clearly charges the cell extraction team member holding the shield (Defendant Butler). Plaintiff is ordered to "stop resisting" while the cell extraction team members attempt to force Plaintiff back into the cell by pushing on each other. Although Plaintiff cannot be seen, it is obvious from the Defendants' positions and body movements that Plaintiff is actively pushing against them. Defendant

---

[4] Defendant Butler is the #1 person on the cell extraction team. His duties included using the shield to pin the inmate to the wall or floor until restraints could be applied. Defendant Tomlin is the #2 team member, and his responsibilities, along with the #3 team member who is not a defendant, included Plaintiff's upper extremities and applying hand restraints. Defendant Lee is the #5 person. His responsibilities, along with the #4 team member who is not a defendant, included Plaintiff's lower extremities.

Blitch ordered the team to push Plaintiff back into the cell and to get the shield out. Plaintiff is ordered multiple times to stop resisting and to put his hands behind his back.

Starting around the 3:40 minute mark, Plaintiff is given several warnings to stop resisting and to let go of the shield. A cell extraction team member (Defendant Tomlin) can be seen using distractionary punches to get Plaintiff to release his grasp.[5] While using the distractionary punches, Defendant Tomlin has a pair of handcuffs in his hand. About 7 seconds later (3:47 minute mark), Plaintiff and some members of the cell extraction team move from the front corner of the cell to the floor on the opposite back side of the cell, and around the 3:50 minute mark, the shield is taken out of the cell. Plaintiff is given multiple orders to stop resisting and give the officers his hand, and one of the team members announced that handcuffs were on at about the 4:25 minute mark. Less than 10 seconds later, the leg irons were on and Plaintiff is assisted to his feet. The entire incident from the time the cell door was opened to the time Plaintiff was being assisted to his feet was approximately 1 minute and 29 seconds.

---

[5] Plaintiff acknowledges that he was holding onto the shower cell bars, although this cannot be seen on the video. Defendant Blitch was ordering Plaintiff to let go of the shield at this time, but Defendant Blitch was not inside the cell.

When Plaintiff exits the cell, he has blood on his head, face, arms, and hands. Plaintiff is escorted to medical where he refused treatment. He was then taken to a shower cell, strip searched, given a change of clothes, and placed in SHOS housing.

Defendants submitted the Declaration of Dr. Whalen, a medical doctor employed by the Department, who averred that he reviewed Plaintiff's medical records. Doc. 59-4 at 1. He asserts that the abrasion Plaintiff received on his forehead "was noted to be midline and superficial in the subsequent SHOS stay. There was no mention of a black eye at the initial evaluation or the subsequent SHOS stay[, and a]t no time was there any mention of a loose or broken tooth." Id. at 1-2. On October 31, 2017, Plaintiff was seen by Dr. G. Espino. See Doc. 76-6 at 6. Plaintiff had "multiple complaints" but upon examination, Dr. Espino indicated that there was "no obvious sequelae of any injuries sustained on Oct 6 '17 incident" and no treatment was warranted. Id.

### III. Standard of Review

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Hinkle v. Midland Credit Mgmt., Inc., 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting Jurich v. Compass Marine, Inc., 764 F.3d 1302, 1304 (11th Cir. 2014)); see Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." <u>Bowen v. Manheim Remarketing, Inc.</u>, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted); <u>see Hornsby-Culpepper v. Ware</u>, 906 F.3d 1302, 1311 (11th Cir. 2018) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotations and citation omitted)). In considering a summary judgment motion, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." <u>Hornsby-Culpepper</u>, 906 F.3d at 1311 (quotations and citation omitted).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (footnote and citation omitted); <u>see Winborn v. Supreme Beverage Co. Inc.</u>, 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam) ("If the movant satisfies the burden of production showing that there is no genuine issue of fact, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" (quoting <u>Shiver v. Chertoff</u>, 549 F.3d 1342, 1343 (11th Cir. 2008)). "A 'mere scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." <u>Loren v. Sasser</u>, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990) (internal quotations omitted)).

12

Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). In cases involving video evidence, the Court will accept the video's depiction of the events if the video "obviously contradicts" the opposing party's version of events. See Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010); see also Morton v. Kirkwood, 707 F.3d 1276, 1284 (11th Cir. 2013) (recognizing that "where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible"). "But where the recording does not clearly depict an event or action, and there is evidence going both ways on it, we take the [the non-movant's] version of what happened." Shaw v. City of Selma, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018).

## IV.    Discussion

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. "[T]he core judicial inquiry is . . . whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). "If force is used 'maliciously and sadistically for the very purpose of causing harm,' then it necessarily shocks the conscience." Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (per curiam) (quoting Brown v. Smith, 813

F.2d 1187, 1188 (11th Cir. 1987)). Courts consider the following factors when analyzing whether force was used maliciously and sadistically:

> (1) "the extent of injury"; (2) "the need for application of force"; (3) "the relationship between that need and the amount of force used"; (4) "any efforts made to temper the severity of a forceful response"; and (5) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them."

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)). "When considering these factors, [courts] 'give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance.'" Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam) (quoting Cockrell, 510 F.3d at 1311).

"The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (internal quotations and citations omitted). Indeed, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9 (citation omitted). "While a lack of serious injury is relevant to the inquiry, '[i]njury and force . . . are only imperfectly correlated and it is the latter that ultimately counts.'" Smith v. Sec'y, Dep't of Corr., 524

F. App'x 511, 513 (11th Cir. 2013) (quoting <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 38 (2010)). "A prisoner may avoid summary judgment, 'only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain.'" <u>Stallworth v. Tyson</u>, 578 F. App'x 948, 953 (11th Cir. 2014) (quoting <u>Brown</u>, 813 F.2d at 1188).

Plaintiff acknowledges that he refused to submit to hand restraints, because he first wanted his personal property to be inventoried in his presence. Staff attempted to gain Plaintiff's compliance before using any kind of forceful response. At deposition, Plaintiff testified that "security came down . . . and he ordered me to cuff up." Doc. 59-1 at 2. Plaintiff made a request to Captain McCray that his property be inventoried, but his request was "disregarded." <u>Id.</u> Defendant Blitch then came and ordered Plaintiff to cuff up, but Plaintiff refused. <u>Id.</u>; Doc. 1 at 8. Plaintiff further acknowledges that Defendant Blitch left, and when he returned, the cell extraction team was with him. Doc. 59-1 at 2; Doc. 1 at 8. Before approaching Plaintiff's cell, at a minimum, Defendants knew that Plaintiff was refusing to submit to hand restraints to be placed on SHOS per a doctor's order and refusing housing.

The video shows Defendant Blitch giving Plaintiff another opportunity to submit to hand restraints, but Plaintiff again refused. Plaintiff's own actions necessitated a need for force. Plaintiff appeared calm when the cell extraction

15

team approached, however, the video shows that as soon as the cell door opened, Plaintiff charged the team members. Plaintiff acknowledged during his interview with the Inspector General's Office and in his deposition that he was holding onto the shower bars and Defendant Tomlin used distractionary punches "to get [him] to release [his] hand from the bars." Doc. 59-1 at 5.[6]

There is no dispute that Defendant Tomlin used distractionary punches to gain Plaintiff's compliance and that while he did so, he had handcuffs in his hand. These punches do not appear on the video to be intended to deliver harm. Sergeant Merritt also acknowledges using one fist strike to Plaintiff's left arm to force Plaintiff to release his grasp on his clothing so Sergeant Merritt could place the handcuffs on his one hand. Despite being in a chaotic situation in a confined space, the video depicts the extraction team as relatively calm and professional while attempting to fully restrain Plaintiff. Once it was announced that handcuffs and leg irons were on, all force ceased and Plaintiff was assisted to his feet. The entire incident lasted about 1 minute and 29 seconds.

Prison officials followed good practice and videotaped the entire cell extraction and the aftermath. While the handheld video does not show every move made by each Defendant or by Plaintiff, it documents the scenario

---

[6] Plaintiff claims that he was holding onto the shower bars because before the team entered the cell, Defendant Tomlin was threatening him. Doc. 59-1 at 2-3, 5; see Doc. 1 at 9.

sufficiently to give an objective view of what happened and "obviously contradicts" Plaintiff's version of events. <u>Pourmoghani-Esfahani</u>, 625 F.3d at 1315.[7]

Plaintiff alleges that he had the following injuries: "numerous bruises and abrasions to his left arm"; "large gashes[] and lacerations"; "los[s] of much essence of life (blood)"; "permanent scarring to the face, scalp, etc."; "a loose tooth and a large gash to the right side of [his] eye"; and a "blackeye." Doc. 1 at 9-10. However, immediately after the use of force, Plaintiff was taken directly to the medical unit where he refused to be examined or treated by the medical staff, so the nurse could only document the injury she could readily see: an abrasion on Plaintiff's forehead. Doc. 59-2 at 4-5. Plaintiff obviously has some injury in light of the blood, but the video does not depict the location of the injury. The video shows blood on Plaintiff's head, face, right arm, and hands, but also shows him walking, including up a flight of stairs and down a long hallway, to the medical unit after the use of force and getting undressed and dressed without difficulty.

Plaintiff did not request any medical attention until ten days after the incident, when, on October 16, 2017, Plaintiff submitted a sick-call request stating that he "sustained multiple gashes to the forehead, right side of eye, and

---

[7] The location of the video camera was necessitated by the situation. It is not practical to expect the video camera could have been located inside the cell.

top of the head," which were causing "dizz[i]ness, blurred vision, [and] excessive headch[e]s." Doc. 76-6 at 8 (some capitalization omitted). On October 31, 2017, Dr. Espino examined Plaintiff and found that there were no obvious consequences of any injury sustained on October 6, 2017, and that no treatment was warranted. <u>See</u> Doc. 76-6 at 6.

Defendants are entitled to summary judgment in their favor. The undisputed evidence establishes that Defendants were justified in using force to accomplish a legitimate security interest, i.e., to obtain Plaintiff's compliance with the order to submit to hand restraints, and that, at worst, Plaintiff received minimal injuries consistent with the amount of force which was necessary to restrain him. Defendants were forced to react to Plaintiff's initial physical attack, and they were required to make split-second decisions to complete their mission: to gain Plaintiff's compliance using the minimal amount of force necessary. Defendants could not predict when, or if, Plaintiff would become compliant, and even if Plaintiff stopped resisting, staff was still required to maintain control of the situation in case Plaintiff decided to become aggressive and/or resistant again. They did this in a confined space, yet they executed their set protocol in a structured manner and used a reasonable amount of force given the threat with which they were faced.

"Although [the Court] cannot pinpoint with precision the amount of force used by [Defendants], the fact that there was no more than minimal injury, that

some amount of force was justified under the circumstances, and that the force was used for a legitimate security purpose persuades [the Court] that the evidence in this case raises only a 'mere dispute over the reasonableness of the particular use of force' and could not support 'a reliable inference of wantonness in the infliction of pain.'" Brown, 813 F.2d at 1189-90 (quoting Whitley, 475 U.S. at 322). Viewing the record in the light most favorable to Plaintiff shows that no reasonable jury could find that Defendants violated his Eighth Amendment rights. Therefore, the Court will grant summary judgment in Defendants' favor.[8] Accordingly, it is

**ORDERED**:

1. Defendants' Motion for Summary Judgment (Doc. 59) is **GRANTED**. The Clerk shall enter judgment in favor of Defendants and against Plaintiff.

2. Plaintiff's Motion for Sanctions (Doc. 79) and Motion to Enforce Sanctions (Doc. 84) are **DENIED**. Plaintiff seeks the imposition of sanctions against Defendants for failing to preserve and/or produce certain evidence, including fixed wing video evidence, the handcuffs Defendant Tomlin used "as brass knuckles when he utilized distractionary blows upon the Plaintiff," and

---

[8] Given that no excessive force was used, Plaintiff cannot maintain a failure to intervene claim against Defendant Blitch.

the clothing and bedding he wore while on SHOS status from October 6-11, 2017. The Court has reviewed the Motions and Defendants' Responses (Docs. 83, 85) and finds no basis for granting the relief requested.

3. The Clerk shall terminate any pending motions and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 5th day of March, 2020.

TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 3/5
c:
Darrell Wayne Butler, #419331
Counsel of Record